McKONE, Respondent, vs. METROPOLITAN LIFE INSURANCE COMPANY, Appellant.

*January 11—April 9, 1907.*

*Principal and agent: Compensation: Slight excess in recovery: Contracts: Agent's liability for losses through fraud of subagents: Negligence: Special verdict: Instructions to jury: Expert testimony: Consideration for promise to pay: Payment by promisee of his own debts.*

1. Evidence tending to show, among other things, employment of plaintiff, or continuation of his employment, for a week after his formal dismissal as agent of defendant, is *held* sufficient to sustain a recovery of salary for that week.
2. An alleged excess of $1.54 in a verdict awarding $134.03 for services, commissions, etc., might well be referred to the rule *de minimis non curat lex.*
3. Contracts under which plaintiff became a district superintendent in defendant's Industrial Department and an agent in its Ordinary Department (providing, among other things, that it should be his duty as such superintendent to nominate agents for appointment by defendant, to instruct such agents, and to see that all agents under his charge made the proper remittances to the home office, and that he should obey and abide by all rules contained in a manual of instructions which declared, among other things, that "each superintendent is personally responsible for moneys received by himself and by his assistants and clerks") are construed to be contracts of employment and not to make plaintiff a guarantor of the defendant against losses in the district from the frauds or defalcations of an assistant superintendent in a detached section of such district with whose nomination or appointment plaintiff had·nothing to do and who, in the matter of reports and remittances, dealt directly with the defendant.
4. Refusal to submit in a special verdict a question as to whether defendant would have suffered any loss if plaintiff had not been guilty of negligence, was rendered immaterial by answers to other questions to the effect that plaintiff was not negligent.
5. Requested instructions as to the liability of an agent to his principal for negligence or omission of duty are *held* to have been fairly covered by an instruction that the agent was bound to exercise reasonable diligence and such skill as is ordinarily possessed by persons of common capacity engaged in the same business or occupation, and that it was for the jury to deter-

mine whether or not, in the particular case, the agent failed to exercise such diligence and such skill.

6. A statement by the trial judge, in submitting questions for a special verdict in an action at law, that they are submitted for the purpose of aiding him to better determine what the final judgment in the case should be, is *held* not to inform the jury that their verdict would be merely advisory.

7. The issue being as to the liability of a district superintendent for losses sustained by an insurance company through fraud of an agent in the district, an insurance inspector was asked whether the fraud would have been possible if collection books had been properly kept by each agent and had been examined and their condition known and reported to the company by the superintendent; and was also asked what such inspection and report would have shown as to the condition of the business. *Held*, that objections were properly sustained on the ground that the questions called for inferences of fact not the subject of expert knowledge and which it was the province of the jury to draw.

8. An instruction to the effect that the jury should find the plaintiff guilty of negligence if the evidence "satisfies" them that he failed to exercise reasonable diligence, etc., was not erroneous because of the use of the word "satisfies," it being apparent that it could not have been misunderstood by the jury.

9. Promises by a district superintendent to make good to the insurance company certain losses sustained by it through defalcations of an agent for which the superintendent supposed himself legally responsible, when in fact he was in no way responsible therefor, were without consideration and void, where they were not made by way of compromise or adjustment of any claim of liability; and the fact that at the request of the superintendent, made in connection with such promises, the company paid its own debts or performed its own obligations to third persons, did not constitute a sufficient consideration for the promises.

APPEAL from a judgment of the circuit court for Rock county: B. F. DUNWIDDIE, Circuit Judge. *Affirmed.*

This is an appeal from the judgment of the circuit court for Rock county upon the verdict of a jury supplemented by findings of the court authorized by stipulation of parties. The action was begun in justice's court, and upon appeal to the circuit court the defendant pleaded a counterclaim containing

eighteen items aggregating $2,715.69. Based on the verdict of the jury in his favor the plaintiff recovered $134.03, which was reduced to $121.79 by offsetting against it the eighteenth item of defendant's counterclaim, allowed by the court in its findings at $12.24, and judgment was rendered in favor of the plaintiff for $121.79 and costs.

The complaint averred that on June 5, 1899, the plaintiff entered the service of the defendant as agent, for which service he was to receive $25 per week; that he performed and that he had been paid for all except the week ending January 16, 1904, for which there was due him from the defendant $25; and then averred claims for other items of commission earned and moneys paid to the use of defendant, in all aggregating $177.37.

The amended answer admitted services by the plaintiff up to January 9, 1904, and pleaded payment of all claims of the plaintiff. The counterclaim averred that plaintiff entered the employment of defendant as general superintendent of the Janesville district, including Janesville, Beloit, Madison, Watertown, and Portage, and that on the recommendation and advice of the plaintiff Otmar W. Andres was appointed assistant superintendent of the detached section of said district in the city of Madison, and entered upon the performance of his duties; "that by virtue of the contracts, agreements, instruction books constituting the contract between the plaintiff and defendant the plaintiff became responsible for the faithful performance of all duties on the part of said assistant superintendents." The duties are then specified to be (1) to obey all orders, carry out all instructions, etc.; (2) to see to it that each of the assistants performs his duties in a diligent, skilful, and faithful manner; (3) "that the plaintiff by virtue of his employment as general superintendent became responsible for all moneys received by himself or his assistants and clerks for said defendant or from said defendant." Then follow items of the counterclaim which may be classed as re-

lating (1) to plaintiff's account in arrears; (2) to premiums collected and converted to his own use by Andres; (3) to moneys received from defendant upon fraudulent death claims made and presented by Andres; (4) valid death claims against the defendant, in which Andres received the money or draft for transmission to the beneficiary but converted the same to his own use; (5) a sum due from plaintiff for rebate on a credential book. In two of the instances arising under class 3 above it was averred also that the draft issued by the defendant in payment of the fraudulent claim was payable to the order of plaintiff and by him indorsed, and in the case of Elizabeth Smith, falling under class 4 above, and in items 1 and 2 of the counterclaim, falling under class 2 above, special promises of the plaintiff to make good the defendant's loss or repay the defendant were averred. By varying forms of expression it was averred that plaintiff committed these acts of conversion and fraud through Andres. The items of the counterclaim may be further classified as items relating to the Ordinary Department of defendant's business, which department, with some immaterial divergence, included policies from $500 upwards; and items relating to the Industrial Department of defendant's business, in which policies were issued in smaller amounts and premiums paid, collected, remitted, and reported on weekly. Of the items of the counterclaim consisting of premiums collected and converted by Andres three relate to the Ordinary Department of defendant's business, and with this exception, and with the exception of the first item for general balance due from plaintiff upon account, all the other disallowed items of the counterclaim relate to transactions in the Industrial Department. The plaintiff had no authority to employ or discharge Andres, and, although he might nominate or select such assistants subject to defendant's approval, he did not do so in the case of Andres.

Upon the special verdict of the jury finding as aforesaid, and finding that the plaintiff was not guilty of any negligence

in the matter of his supervision of the Madison district or in forwarding checks to Andres, and the findings of the court that the plaintiff had accounted for and paid over to the defendant all sums of money which came into his hands as agent or superintendent of the defendant, and that Andres was at no time the agent of the plaintiff, but was the agent of the defendant with whom the defendant corresponded, dealt, and treated directly in both the Industrial and Ordinary Departments, and that, except the claim for balance due on account above mentioned, all the shortages, defalcations, and procuring of money by forgeries occurred in the Madison office of said Andres, all the other items of the counterclaim were disallowed and judgment rendered as aforesaid.

Error is assigned upon the ruling of the court below compelling the defendant to elect at the commencement of the trial whether it would proceed in tort or upon contract in respect to its counterclaim; in the exclusion of evidence; in submitting to the jury the right of the plaintiff to recover the item of $25 wages; in refusing to submit to the jury whether or not the defendant would have suffered loss on account of the fraudulent death claims had not the plaintiff been guilty of negligence; in submitting to the jury questions relating to the negligence of plaintiff in the matter of supervision of the department; in refusing to give certain requested instructions to the jury; in charging the jury; in refusing to strike out three of the questions and answers of the special verdict; in refusing to make findings requested by defendant; in making the findings signed by the court, except the first and third findings; in not covering all the issues involved in the findings of fact; in submitting the question of the negligence of the plaintiff in forwarding two drafts to Andres; in not finding for the defendant on each item of the counterclaim submitted to the court, except items 4 and 18; and in not submitting to the jury, or himself finding on the proof submitted, the fact of loss to the company by forged and

fraudulent death claims; and in not finding as to the truth of each item set up in the counterclaim.

*Wilson Lane* and *William Smith,* for the appellant.

*M. O. Mouat* and *Edward H. Ryan,* attorneys, and *O. A. Oestreich,* of counsel, for the respondent.

The following opinion was filed January 29, 1907:

TIMLIN, J.    There is considerable confusion in the record of this cause, some inconsistency and lack of clearness in the errors assigned, and a wide divergence between the facts pleaded in the counterclaim and the facts admitted or proven. The preliminary ruling of the court requiring the defendant to elect whether it would proceed in tort or upon contract seems to have had no injurious effect upon defendant's rights; for, notwithstanding this, the cause was tried with reference to the plaintiff's liability for negligence and with reference to his liability *ex contractu,* and these would seem to cover all possible grounds of liability suggested by the evidence. It is not contended that the plaintiff participated in the frauds or misappropriations committed by Andres. In submitting to the jury the right of the plaintiff to recover the item of $25 wages, some weight was no doubt given to the letter of the defendant discharging the plaintiff, which, after declaring, "You are hereby dismissed from the service of this company, to take effect January 9th," stated, "If you feel so disposed, you may remain with Mr. Mott during the week of January 11th, giving him such information as you may possess concerning the conduct of the district, and for that week we will pay you the equivalent of the weekly salary which you have heretofore been in receipt of." Evidence was given tending to show that the plaintiff accepted this employment, or continuation of employment, reported for and entered upon the discharge of his duties, but before the end of the week Mr. Mott refused to continue his services, and the plaintiff earned no money at any other employment during that week.

McKone v. Metropolitan Life Ins. Co. 131 Wis. 243.

This evidence came in without objection under the complaint, and seems sufficient to sustain a recovery under such circumstances. *Forcy v. Leonard,* 63 Wis. 353, 24 N. W. 78, and cases cited. The claim of appellant that there is included in the amount of the jury's verdict an excess of $1.54 might well be referred to the rule *de minimis non curat lex;* but the appellant has not made it to appear that there is such excess included in the verdict, and error must be made to appear clearly and affirmatively.

Before considering the other assignments of error it will be convenient, for the purpose of grouping and considering together some of such assignments of error, to take up the contract relations between the parties. June 5, 1899, the plaintiff entered the employment of the defendant as "superintendent in the Industrial Department" under a written contract prescribing with considerable detail the duties of the plaintiff. Prominent among these duties was that of nominating to the company for appointment suitable agents for the Industrial Department and instructing such agents in the details of the work, the duty to obey orders and carry out the instructions of the company, to see that all agents under plaintiff's charge sent to the home office weekly a true account of all moneys received by them during the week and remitted for the same less their authorized deductions, to pay all charges for expenses of every kind incident to the carrying on of the defendant's business in his district, not to resign without at least seven days' notice to the defendant, and, in case of resignation or dismissal, to introduce to his successor all the assistants and agents in his district, to make no contracts except in accordance with the instructions from defendant's officers, etc. The contract also contained these words:

"I further agree that any advances or allowances made to agents or others under my charge shall be borne by me."

A salary of $25 a week, together with a contingent amount payable at the end of the year, was provided as compensation

for the plaintiff.  On June 10, 1899, the plaintiff was appointed an agent of the defendant's Ordinary business, and in this contract he agreed to obey and abide by all the rules contained in the circular letter and manual of the defendant, and for these latter services as agent he received a commission on premiums collected.  The manual of instructions which it is claimed was delivered to plaintiff some time after the execution of the contract of June 5, 1899, under the chapter thereof relating to superintendents' responsibility for collections, provided:

"Each superintendent is personally responsible for moneys received by himself and by his assistants and clerks.  Superintendents must decide as to the advisability of requiring bonds from their assistants, clerks, and others."

The instruction book in the Ordinary Department provided that the defendant would deal only with the plaintiff as to applications received from his district, except where special arrangement is made with his detached assistants, if any.  It also defined the word "canvasser" to mean all those employed by the plaintiff to solicit ordinary insurance, and provided that such persons would be the agents of the plaintiff and not the agents of the defendant in the Ordinary Department. Although plaintiff had nothing to do with the nomination or appointment of Andres, and although Andres in the matter of remittances and reports and receipts dealt directly with the defendant, yet the plaintiff did take a bond from Andres in the sum of $500, conditioned to make good and reimburse to the plaintiff such loss of money, securities, or other personal property belonging to the plaintiff or in plaintiff's possession, or for which the plaintiff might be liable, as might be sustained by the plaintiff by reason of the fraud or dishonesty of Andres occurring between June 15, 1903, and June 14, 1904.  The plaintiff also to some degree exercised a supervision over the Madison office.  But the counterclaim by introductory averments and with reference to all its items, "Or-

dinary" or "Industrial," designates the city of Madison as a detached section of the plaintiff's district, and the testimony of the witness E. E. Mott shows that remittances in the Industrial Department from a detached section are forwarded directly to the company, at least whenever desired by the superintendent of the district, and probably the majority of agents or assistants in detached districts conduct their business in that way. The business of the Madison office was in fact so carried on. The contract with the plaintiff, whether modified or interpreted by the manual of instructions or not, was in its essential features a contract of employment, and cannot be held to be an obligation to absolutely guarantee the defendant against losses in the superintendent's district, except so far as specifically provided in the contract. The contract obligations thereof relate to agents and assistants under the direct control of plaintiff, who collected for plaintiff and reported and remitted to him. No specific provision of this contract has been called to our attention which would make the plaintiff liable for the frauds or conversions of Andres or for the failure of Andres to remit to the defendant the moneys collected by Andres for premiums.

By the contract made by the defendant with Andres which bears date May 27, 1901, the latter has authority to nominate for appointment agents for the Industrial Department and to instruct them in the details of the work, and "to see that all agents under my charge send to the home office each week on the day required and on the forms provided by the company true accounts of all moneys received by them, and remit for the same as provided by their agreements." This seems to authorize Andres and those under his charge to report and remit directly to the home office. The plaintiff had no authority to employ or discharge Andres. The plaintiff might, therefore, well have some supervision as a superior employee of the defendant over Andres' office, and yet not be liable *ex contractu* for the frauds or defalcations of Andres. It was,

however, not improper to submit to the jury in the special verdict questions relating to the negligence of the plaintiff in the matter of supervision, and the questions submitted relating to this subject are amply sufficient to cover each department of the defendant's business.

The case standing in this way, the defendant assigns error upon the refusal of the court to submit the following question in the special verdict:

"Would defendant have suffered any loss on account of fraudulent death claims had not plaintiff been guilty of negligence in attending to his duty?"

The defendant requested the court to charge:

"That the plaintiff was charged with diligence and care in looking after and protecting the interests of the defendant at the Madison agency. He was superintendent of the district of which the Madison agency was a part. It was his duty to carefully inspect that office and the business originating therefrom, to institute any and all investigation which a prudent and careful man under the circumstances would have instituted. On receiving credible information that the business at the Madison agency was being conducted in an irregular or improper manner, it was his duty to place the defendant company in possession of such information and to have on his own initiative instituted a thorough investigation of the business of that office. If through the neglect of duties on the part of plaintiff the defendant met with loss, the plaintiff is liable to such loss; that is to say, if you shall find that, had the plaintiff performed the duties imposed upon him by the terms of his employment, no loss would have occurred to the defendant, or not so great a loss, then the plaintiff is liable for any loss the proof shows the defendant suffered that it would not have suffered but for such neglect of duty," etc.

Also: "If an agent violates his duties and obligations to his principal, whether by exceeding his authority or by positive misconduct or by negligence or omission in the proper functions of his agency, or in any other manner, and any loss or damage results therefrom to the principal, he is responsible therefor, and must make full indemnity."

Also: "The liability of the agent to his principal is to be

determined by ascertaining the nature and scope of the duty owed to him. Liability follows from the nonperformance of a legal duty."

Also: "It was the duty of the plaintiff to bring to the performance of his undertaking, and to exercise in such performance, that degree of skill, care, and diligence which the nature of the undertaking and the time, place, and circumstances of the performance justly and reasonably demanded. A failure to do this, whereby the defendant suffered a loss or injury, constitutes negligence for which the plaintiff is responsible."

The question proposed by defendant for the special verdict is covered in a more accurate and comprehensive form by the ninth question of the special verdict submitted and rendered immaterial by the findings of the jury in answer to the third, fourth, and eighth questions of the special verdict, to the effect that the plaintiff was not guilty of negligence.

The request first quoted is faulty, in that it invades the province of the jury by assuming that the plaintiff received credible information that the business at the Madison agency was being conducted in an irregular and improper manner, and in stating that it was plaintiff's duty to carefully inspect the Madison office and the business originating therefrom and to institute investigations. This did not appear so clearly from the evidence to be within his duty as to be a matter of law.

The other requested instructions seem to be fairly covered by the following instruction given to the jury:

"The plaintiff as superintendent or agent of the defendant company was bound not only to exercise good faith in the performance of his duties, but he was also bound to exercise reasonable diligence, and to exercise such skill as is ordinarily possessed by persons of common capacity engaged in the same business or occupation. Reasonable diligence and ordinary skill, the law requires that; and good faith, also, the law requires that of every agent. Now, whether *Mr. McKone* failed to exercise such diligence and such skill or not in the supervision of the Madison district is for you to determine from the evidence under the instructions of the court," etc.

The fifth and eighth assignments of error complain of submitting to the jury the third, fourth, fifth, sixth, and eighth questions in the special verdict, and in refusing to strike out those questions, and answers thereunto, on motion after verdict, and in refusing to strike out of the special verdict the questions and answers 5, 6, and 7, and in refusing to set aside the verdict and grant a new trial. This seems to be an illogical and disorderly mode of assigning error, which might justify the court in refusing to consider errors so assigned.

But the questions of the special verdict referred to are as follows:

"(3) Was the plaintiff *McKone* guilty of any negligence in the matter of the supervision of the Madison district in the Ordinary Department? *A.* No. (4) Was the plaintiff *McKone* guilty of any negligence in the matter of the supervision of the Madison district in the Industrial Department? *A.* No. (5) Was check, Exhibit 29, for $240.20 received by *Mr. McKone* through the mail? *A.* No. (6) Was check, Exhibit 31, for $225 received by *Mr. McKone* through the mail? *A.* No. (7) Was check, Exhibit 32, for $207 received by *Mr. McKone* through the mail? *A.* No. (8) Was *McKone* guilty of negligence in forwarding checks to Andres for delivery to him? *A.* No."

It is claimed that these questions were submitted to the jury apparently on the theory that questions are submitted to a jury in an equity case for the purpose of aiding the court in determining what the final judgment should be, and that the verdict in law was not advisory. This is apparently based upon a statement in the charge of the court to the jury, in which the court stated:

"For the purpose of aiding me to better determine as to what the final judgment in this case shall be, I will submit to you in the form of questions certain matters, however, which you will determine from the evidence under the instructions of the court, to the end that I may be aided in rendering a proper judgment by the answers that you will make to these questions."

This language of the court seems to be intended to describe to the jury the function of a special verdict in an action. It is not excepted to, and does not inform the jury that the verdict is advisory, and no question of its accuracy could be raised unless by exception to that portion of the charge. The questions of the special verdict quoted were properly submitted on the evidence before the court. Consequently both the objections thereunto and the motions to change or strike out are unavailing.

The defendant offered evidence as follows, upon the exclusion of which error is, assigned: E. E. Mott, inspector for defendant, who had been for about nine years looking up offices, consulting superintendents, taking charge of districts where there was a change of superintendents, and making investigations, was recalled, and asked whether if the Madison office had been inspected, and if collection books had been kept, it would have been possible for those fraudulent and forged claims to have been presented to the defendant without the latter having notice of the fact that they were based on policies upon which no payments for death losses were collectible. Objection to this was sustained, whereupon the question was put as follows:

"If collection books had been kept by each agent who was working under the assistants, had been properly kept, their condition examined and known and reported by *Mr. McKone* to the office, you may state what such inspection and report would have shown as to the condition of the business."

This was objected to as incompetent and immaterial and for other reasons, and the court below sustained the objection on the ground that thereby the witness was asked to pass opinion upon books not in evidence, and that if the books were in evidence the jury would be as competent to find this opinion as the witness. After several further attempts to give this kind of evidence, and after argument, the court ruled that the defendant might show by testimony what the plaintiff's duties were under his contract, and whether he performed

these duties or not; that the result of nonperformance was not a question for an expert or for opinion evidence. This ruling seems to be correct. The questions were not hypothetical in form, and called for inferences of fact not the subject of expert knowledge and which it was the province of the jury to draw. *Oleson v. Tolford,* 37 Wis. 327; *Mellor v. Utica,* 48 Wis. 457, 4 N. W. 655; *Luning v. State,* 2 Pin. 215; *Daly v. Milwaukee,* 103 Wis. 588, 79 N. W. 752; *Lounsbury v. Davis,* 124 Wis. 432, 102 N. W. 941.

There was no reversible error in that part of the charge of the court below which instructs the jury that, if the evidence in the case satisfies them that the plaintiff did fail to exercise reasonable diligence and ordinary skill as theretofore explained, they should answer the question relative to plaintiff's negligence in the affirmative. Exception is taken and error assigned on the use of the word "satisfies" in this connection. It could not have been misunderstood by the jury, and its use in this connection seems to be justified by similar use in the following cases: *Pelitier v. C., St. P., M. & O. R. Co.* 88 Wis. 521, 529, 60 N. W. 250; *Gores v. Graff,* 77 Wis. 174, 46 N. W. 48. There seems to be no serious or reversible error in the form of the special verdict or in the charge of the court.

There remains to be considered the legal effect of the promises of the plaintiff. Andres absconded on November 21, 1903, after perpetrating the frauds mentioned. In a letter dated December 31, 1903, relating to a premium of $7.17 collected by Andres from one Mary Houser on policy No. 324,730, the plaintiff wrote to the defendant, stating:

"The money was never remitted to this office, and was, I expect, appropriated by ex-assistant. I will see that the amount is remitted to company, and will thank you to forward her January 8th receipt by return mail."

There was no act done by defendant after receipt of this letter, except, perhaps, to forward the January 8th receipt. In another letter by the plaintiff to the defendant under date of November 27, 1903, the plaintiff reports some of the de-

falcations of Andres so far as discovered, expresses his grief that such a thing should have occurred, and states:

"The cashier division are writing to me for those Industrial remittances for weeks of November 9th and 16th. I am unable to pay at this time, Mr. Taylor, but I am not going to skip out, and am willing to do the right thing as soon as I can, and would be pleased if you would so inform them."

Under date of November 25, 1903, plaintiff again wrote, informing the defendant of a sum due to one McCarthy which had been intercepted and misappropriated by Andres. This letter stated:

"Please forward me by return mail a check for that amount. I realize my responsibility in the matter, and when we get the account entirely finished up and know the exact shortage I will see that the company is reimbursed for this $35.09."

The defendant did not remit upon either of the last promises, but the plaintiff paid the $35.09 out of money in his hands belonging to the company. In still another case Andres converted to his own use a draft for $144 sent by the defendant to Andres for the purpose of paying a death loss of that amount in the Industrial Department. The creditor of the defendant had received no part thereof, and this amount was due from the defendant to such creditor or beneficiary of the death loss. The plaintiff, doubtless under the impression that he was liable, wrote to the defendant under date of November 25, 1903, substantially as follows:

"As I understand it, check for $144 for payment of above-mentioned claim was forwarded to Andres under date of November 9th for payment. . . . I saw the claimant today, investigated the matter, and I know the claim has not been paid. Claimant is to meet me Wednesday, December 2d, at Madison, and I would ask that company send me another check for the claimant by return mail, so this matter can be settled, as company's reputation is at stake. Of course, when Mr. Andres' accounts are finally audited, I will see that this amount is returned to the company. . . ."

The company remitted the $144, and for such second re-mittance claims to hold the plaintiff liable on the contract said to be contained in the letter above quoted.

The circuit court found in its ninth finding "that subse-quent to the defalcations and shortages of said Andres at said Madison office the plaintiff wrote to defendant and its officers certain letters offered in evidence containing promises to make good certain of said losses occasioned by the acts of said Andres; that there was no consideration for said promises contained in said letters." All understand that a considera-tion is essential to the binding force of a contract. But what is a consideration is not so clear in all cases. If a claim is made in good faith that one is liable for the payment of a sum of money, and in compromise of such claim he promises to pay that sum of money, his promise would rest upon a suf-ficient consideration, but a "promise to pay where there is no legal obligation, if made in ignorance of rights or under sur-prise, will not bind." *Logan v. Mathews,* 6 Pa. St. 417. This was where the promisor, believing that he was liable for the repairs of a carriage, promised to pay for the same. In the case at bar there is no evidence of compromise, adjust-ment, or dispute at or prior to the time of making the prom-ise.

"An express promise to pay a sum of money, which the promisor at the time of making the promise is under no legal, equitable, or moral obligation to pay, is a mere *nudum pac-tum.*" *Martin v. Stubbings,* 20 Bradw. (Ill. App.) 381.

"A promise made by one who has traveled on a turnpike road to pay tolls is *nudum pactum,* if the promisor was un-der no obligation to pay the tolls." *Waterloo T. R. Co. v. Cole,* 51 Cal. 381.

"A promise by the master to pay stolen money received by his slave, which has not come to his own hands, is without consideration, and will not support an action." *Jelks v. McRae,* 25 Ala. 440.

Further illustrations may be found in *Nichols v. Mitchell,* 30 Wis. 329; *Messenger v. Miller,* 2 Pin. 60; *Eycleshimer*

*v. Van Antwerp,* 13 Wis. 546. In *Frey v. Fond du Lac,* 24 Wis. 204, and *Hooker v. Knab,* 26 Wis. 511, it is said that a promise for a past consideration, for which there is not and never has been any legal liability on the part of the party promising, does not create an enforceable contract.

But the case at bar also presents the much discussed question of the sufficiency of a consideration which consists of the promise to perform and the performance of the existing contract obligations of the promisee to a third person. Wald's Pollock, Cont. (3d ed.) 206, 209, *186, *190; 1 Pars. Cont. (9th ed.) note 1, bottom pp. 475, 476; 12 Harv. Law Rev. 515, 519. This question is not new in this state, but has been settled adversely to the validity of such contracts in *Davenport v. First Cong. Soc.* 33 Wis. 387, where it is said:

"It was proposed to show that the plaintiff agreed to surrender and discharge all his debts against the defendant, providing the defendant would, within a reasonable time, pay its indebtedness to its former pastor; and that the defendant accepted the proposition, and at a good deal of trouble and expense raised money and discharged that indebtedness. The only consideration for plaintiff's promise upon these facts was the payment by the defendant of a debt justly due. It might cause the defendant some trouble and inconvenience to pay its debts, but we are not aware of any principle of law which would make such payment alone a sufficient consideration for a promise on the part of its creditor to relinquish his claim."

Other cases to this effect are cited in the notes to *Abbott v. Doane,* 34 L. R. A. 33 (163 Mass. 433, 40 N. E. 197). The mere incidental benefit which might result to the plaintiff holding his position as superintendent at the will of the defendant from the payment of its own debts or the performance of its own obligations to third persons was not, under the circumstances, a consideration for the plaintiff's promise. *Comm. Nat. Bank v. Smith,* 107 Wis. 574, 577, 83 N. W. 766; *Clapp v. Webb,* 52 Wis. 638, 9 N. W. 796; *Havana P. D. Co. v. Ashurst,* 148 Ill. 115, 35 N. E. 873

The other matters found by the court below, viz., that there is no sum of money owing to the defendant by the plaintiff; that it was not shown that Andres collected the items of $200.25, which he attempted to remit, or the item of $198.46, for which he made statement, and that the plaintiff was not guilty of negligence in indorsing in blank and forwarding to Andres checks sent to plaintiff by the defendant for the purpose of paying claims against the defendant arising in Andres' district, seem to be supported by evidence and within the scope of the stipulation authorizing the court to determine all matters not covered by the verdict of the jury. What is the proximate cause of a loss or injury is usually a question of fact, and it is difficult to find in this record any evidence that the losses sustained by the defendant through the frauds of Andres were caused by any act or omission of the plaintiff. The defendant's representative Howry in October, 1903, after many of the frauds of Andres were committed and at the instance of the defendant, visited, examined, and checked up the Madison office of Andres, and apparently did not find or report anything improper or unusual in the conduct of that office. But we have considered the case as if there was such proof because the case was tried and presented on that theory. We find no reversible error in the case.

*By the Court.*—The judgment of the circuit court is affirmed.

A motion for a rehearing was denied April 9, 1907.